UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| HOBBY LOBBY STORES, INC, : | |
| : | Civil Docket No. 20-CV-2239 |
| Plaintiff, : | |
| - against - : | |
| : | **COMPLAINT** |
| CHRISTIE'S INC. and JOHN DOE #1, : | |
| : | **JURY TRIAL DEMANDED** |
| Defendants. : | |

_____

Plaintiff Hobby Lobby Stores, Inc. ("Hobby Lobby"), by and through its attorneys, Pearlstein & McCullough LLP, as and for its Complaint, alleges as follows:

**PRELIMINARY STATEMENT**

1.  In this action, Plaintiff Hobby Lobby asserts claims for fraud and breach of express and implied warranty in connection with an ancient Mesopotamian cuneiform tablet bearing part of the *Epic of Gilgamesh*, c. 1600 BC (the "Tablet"). Pursuant to a Private Sale Agreement dated July 14, 2014 (the "Private Sale Agreement") among (i) Hobby Lobby, as Buyer, (ii) Christie's, Inc. ("Christie's") as Seller's agent, and (iii) John Doe #1, Christie's consignor, as Seller,[1] Hobby Lobby purchased the Tablet from Defendants (the "Purchase") for $1,694,000 (the "Purchase Price"). The Tablet, which Hobby Lobby presently owns, is the subject of a civil forfeiture action filed today in this Court by the United States Attorney for the Eastern District of New York ("Forfeiture Action") seeking recovery of the Tablet on the ground that it was stolen from Iraq and imported into the United States in violation of one or more laws that prohibit, among other things, the sale of stolen antiquities and the importation of antiquities (including ancient cuneiform objects) from Iraq after 1990.

---

[1] The Private Sale Agreement did not disclose the identity of Seller.

1

2.     In connection with the sale of the Tablet to Hobby Lobby, Defendants made certain representations and warranties that, unknown to Hobby Lobby, were false. They made implied warranties under the New York Uniform Commercial Code as to the seller's good title to the Tablet and its merchantability (*i.e.*, salability). The Private Sale Agreement, moreover, contained express warranties, none of which could be squared with the facts, that John Doe #1 (i) owned the Tablet, (ii) had the right to transfer ownership of the Tablet free of restrictions or claims by a third party, and (iii) had met all import and export requirements and was not aware that any third party had failed to do so. Christie's, prior to the Purchase, also knowingly made misrepresentations to Hobby Lobby that amount to both a breach of express warranty and fraud concerning the Tablet's provenance (*i.e.*, its history of ownership and chain of title), adopting and affirming a fictitious history created without basis in fact by a previous owner about a 1981 sale of the Tablet in the United States in order to disguise the illegal importation of the object into the United States after 1990.

3.     The U.S. Government's forfeiture of the Tablet renders the Tablet unsalable and worthless to Hobby Lobby, which stands to lose both the Tablet and the entire value of the Purchase Price it paid to Defendants. Accordingly, Hobby Lobby intends to appear in the Forfeiture Action as a claimant and seeks to join its breach of warranty and fraud claims in the present case with the Forfeiture Action.

## THE PARTIES

4.     Plaintiff Hobby Lobby is a corporation formed under the laws of the state of Oklahoma with its principal place of business at 7707 SW 44th Street, Oklahoma City, Oklahoma, 73139.

5. Upon information and belief, Defendant Christie's is a corporation formed under the laws of the state of New York with its principal place of business at 20 Rockefeller Plaza, New York, New York, 10020.

6. Upon information and belief, Defendant John Doe #1 is a private art collector who resides in London, United Kingdom.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. This Court has personal jurisdiction over the defendants because they are domiciled and/or regularly transact business in New York City and/or because this action arises out of the transaction of business in New York City.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Christie's acted in furtherance of its fraud when it imported the Tablet within this judicial district.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**Mesopotamian Cuneiform Tablets on the International Art Market**

10. Cuneiform, one of the earliest systems of writing, was created and used by the Sumerians in ancient Mesopotamia, who formed characters by impressing triangular-shaped wedges into wet clay tablets. The term cuneiform comes from *cuneus*, Latin for "wedge."

11. Cuneiform tablets have been collected by museums and private collectors in the United States since the 19th century. However, from the inception of the First Gulf War in 1990, the United States has maintained a ban on imports of cultural property originating in Iraq under

(i) a series of UN Security Council Resolutions and Executive Orders issued by Presidents George H.W. Bush and George W. Bush,[2] (ii) 2004 Congressional authorization providing the President with authority under the Convention on Cultural Property Implementation Act,[3] and (iii) comprehensive sanctions regulations issued by the Department of Treasury.[4] Since 1990, these laws and regulations have, among other things, made illegal the importation of ancient cuneiform objects removed from Iraq after August 1990.

12. To comply with applicable United States' import laws, prudent, law-abiding cuneiform collectors are careful to deal only in objects with an ownership history dating prior to 1990, establishing that the object was outside of Iraq and not stolen as of that date. Consequently, a provenance that documents the chain of title of Iraqi-origin cuneiform to a date prior to August 1990 is critical to a collector's ability to demonstrate lawful ownership of and transferable title to an object.

13. Collectors also rely on the expertise of sophisticated art sellers, such as established galleries and auctioneers, to verify an object's legal ownership. Accordingly, the sale of an object at a reputable auction house indicates to the art market that the auctioneer considers the object to be legally owned, and the art market, in turn, relies on the auctioneer's imprimatur of legality with respect to future sales, loans and exhibitions.

14. Since the late 1990's, Christie's, the largest and most renowned auction house in the world, has publicly claimed to conduct careful provenance research and scholarship on all

---

[2] Executive Order 12722 of August 3, 1990; United Nations Security Council Resolution No. 661 of August 6, 1990; Executive Order 12724 of August 13, 1990; United Nations Security Council Resolution 1483; and Executive Order 13350 of July 30, 2004.
[3] The Emergency Protection for Iraqi Cultural Antiquities Act of 2004 (title III of Pub. L. 108-429); Final rule, Import Restrictions Imposed on Archaeological and Ethnological Material of Iraq, Federal Register, Vol. 73, No. 84, Wednesday, April 30, 2008, at p. 2334 (available at https://www.govinfo.gov/content/pkg/FR-2008-04-30/pdf/E8-9343.pdf).
[4] Iraq Stabilization and Insurgency Sanctions Regulations, codified at 31 C.F.R. part 576, were promulgated in a Final Rule by the Department of the Treasury's Office of Foreign Assets Control on September 13, 2010.

antiquities it offers for sale. The sale by Christie's of an antiquity represents a "gold standard" of certification that an object is legally owned and may be offered for sale on the international market.

**The Tablet**

15. The best-known piece of literature from ancient Mesopotamia is the story of Gilgamesh, a legendary ruler of Uruk, and his search for immortality. The *Epic of Gilgamesh* is a voluminous work, the longest piece of literature in Akkadian, the language of Babylonia and Assyria. It was known across the ancient Near East, with versions also found at Hattusas (the capital of the Hittites), Emar in Syria, and Megiddo in the Levant.

16. The Tablet was likely created during the First Sealand Dynasty, circa early sixteenth century, B.C., in the middle Babylonian period. Sealand refers to a province in the far south of Babylonia, a swampy region between the mouths of the Tigris and Euphrates rivers in modern-day Iraq.

17. Upon information and belief, the Tablet was first seen on the international art market by a dealer in the United States (the "American Dealer") in 2001 while the Tablet was in the possession of a Jordanian antiquities dealer in London. Upon information and belief, in 2003, the American Dealer purchased the Tablet in London and imported it into the United States.

18. Upon information and belief, in February 2007, the American Dealer sold the Tablet to a pair of buyers ("2007 Buyers") for $50,000 without supplying a provenance, but later, upon request, supplied the 2007 Buyers with a fictitious provenance that the Tablet had been part of an auction sale on August 20, 1981 at Butterfield and Butterfield, San Francisco ("Butterfield's"), lot number 1503 (the "Butterfield's Provenance").

19.     Upon information and belief, in 2007, the 2007 Buyers sold or consigned the Tablet to Michael Sharpe Rare and Antiquarian Books in Pasadena, California ("Michael Sharpe") using the Butterfield's Provenance. Michael Sharpe published a catalogue including the Tablet with an asking price of $450,000.

20.     Upon information and belief, John Doe #1 purchased the Tablet prior to the fall of 2013 from an intermediate owner.

**Christie's Fraudulent Sale of the Tablet**

21.     Upon information and belief, John Doe #1 consigned the Tablet to Christie's in London for sale in the fall of 2013.

22.     In March of 2014, Hobby Lobby, through an agent, viewed the Tablet at Christie's in London. As Christie's was aware, Hobby Lobby was active in the private art market in building a biblical antiquities collection to serve as the base collection for a new museum planned to be built in Washington, DC, the Museum of the Bible ("MOTB").

23.     Christie's International Head of Books, Margaret Ford ("Ms. Ford") provided Hobby Lobby with a specially prepared private sale catalogue (the "Private Sale Catalogue") for the Tablet that included the following provenance:

> **Provenance**
>
> Butterfield and Butterfield, San Francisco, 20 August 1981, lot 1503.
>
> with Michael Sharpe Rare and Antiquarian Books, Pasadena, California

24.     The provenance disclosed by Christie's in the Private Sale Catalogue thus (i) included the fictitious Butterfield's sale in San Francisco in 1981, (ii) omitted any reference to the American Dealer who had imported the Tablet into the United States in 2003, and (iii) listed Michael Sharpe, an American bookseller, as the only subsequent possessor of the Tablet

6

following the Butterfield's auction. Christie's thus intentionally left Hobby Lobby with the erroneous impression that the Tablet had been imported into the United States at a time when there were no import restrictions on Iraqi cultural property and that the Tablet had remained in the United States since 1981. According to the Government's Forfeiture Complaint, however, the American Dealer had illegally imported the object in 2003. Hobby Lobby had no basis to question the accuracy of the provenance Christie's provided in the Private Sale Catalogue.

25. Upon information and belief, unknown to Hobby Lobby, Christie's Head of Antiquities in London, Georgiana Aitken ("Ms. Aitken") had contacted the American Dealer via email in December 2013 to verify the Butterfield's Provenance and was advised by the American Dealer over the telephone that the Butterfield's Provenance could not be verified and would not withstand the scrutiny of a public auction. Ms. Aitken and Christie's knew or should have known that this portrayal of the provenance signified that the Butterfield's Provenance was false. Nonetheless, Christie's proceeded to sell the Tablet to Hobby Lobby.

26. Prior to consummating the Purchase, Hobby Lobby asked Christie's to provide it with all the information and documents Christie's possessed to support the provenance in the Private Sale Catalogue. In response, a Christie's representative sent an email to a Hobby Lobby representative stating that (i) the Tablet left Iraq before 1981, as it was sold in a Butterfield's auction in San Francisco in that year, (ii) the Butterfield's buyer had confirmed to Christie's that the Tablet was part of lot 1503 in the Butterfield's auction, and (iii) the Butterfield's buyer told Christie's that the Tablet was said to have been de-accessioned from a small museum prior to being offered for sale by Butterfield's, so the object was likely within the US well before 1981. In addition, Christie's provided Hobby Lobby with copies of the Butterfield's and Michael Sharpe catalogues, but provided no verifiable information or documents supporting the

7

connection between the buyer in the 1981 Butterfield's sale and Michael Sharpe's sale offering, thereby leading Hobby Lobby to believe that Christie's possessed none. Hobby Lobby has since learned from the Forfeiture Complaint that Christie's deliberately withheld from Hobby Lobby (x) the name of the American Dealer, (y) the fact that the American Dealer had bought the Tablet in London and had imported it in 2003, and (z) a copy of the American Dealer's 2007 letter attesting to the provenance.

27. In July 2014, pursuant to the Private Sale Agreement, Hobby Lobby agreed to purchase the Tablet for the $1,674,000 Purchase Price.

28. Section 2 of the Private Sale Agreement (captioned "Seller's Warranties") contains, among other things, express warranties that the Seller:

    a. is the owner of the Property or a joint owner of the Property acting with the permission of the owner or co-owners or, if the Seller is not the owner of the Property, the Seller has the permission of the owner(s) to sell the Property;

    b. has the right to transfer ownership of the Property to you without any restrictions or claims by anyone else; and

    c. at the time of the handing over the Property to us, has met all requirements relating to exporting or importing the Property and is not aware that anyone else has failed to meet these requirements.

29. None of the Seller's Warranties could be made honestly given the information possessed by Christie's in its capacity as the Seller's agent.

30. After the Purchase, Christie's imported the Tablet into the United States. In September 2014, Ms. Ford personally delivered the Tablet to Hobby Lobby from New York to Oklahoma City by plane.

**Christie's Fraudulent Reaffirmation of the Fictitious Provenance**

8

31. After the Purchase, Hobby Lobby transferred possession of a group of objects, including the Tablet, to MOTB. The Tablet was to be included in the initial display at MOTB's opening on November 17, 2017. Prior to the opening in 2017, Hobby Lobby through MOTB asked Christie's to reaffirm the Butterfield's Provenance. In addition, a MOTB representative asked a Christie's representative to provide the names of the Tablet's owners prior to Michael Sharpe.

32. In response to Hobby Lobby's request through MOTB, representatives of Christie's Antiquities Department in London (i) provided Hobby Lobby and the MOTB with additional but, upon information and belief, incomplete documentation concerning the Tablet's provenance, thus leaving Hobby Lobby with the false impression that Christie's possessed no other documents concerning the Tablet's provenance, and (ii) upon information and belief, after unsuccessfully attempting to contact the American Dealer in the fall of 2017, falsely and recklessly represented to Hobby Lobby and the MOTB that the American Dealer had confirmed the accuracy of the Butterfield's Provenance in 2014. Christie's "doubled down" on the Butterfield's Provenance without any new information upon which to rely, thereby compounding the fraud and breach of warranty and depriving Hobby Lobby of the opportunity to discover the fraud.

**The Government's Seizure of the Tablet**

33. On September 24, 2019, agents from the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") appeared at MOTB and seized the Tablet pursuant to an ongoing investigation of the Tablet's origin and its importation into the United States.

34. On January 23, 2020, counsel for Hobby Lobby met with representatives of ICE to discuss the Tablet's seizure and the status of ICE's investigation. At this meeting, Hobby Lobby learned for the first time that the Tablet had been stolen from Iraq, sold by Christie's with a false provenance, illegally imported by the American Dealer in 2003 and illegally imported by Christie's in 2014 in violation of the National Stolen Property Act[5] and applicable U.S. import restrictions. ICE requested that Hobby Lobby consider voluntarily stipulating to the Tablet's forfeiture to the United States.

35. From February through the end of April 2020, counsel for Hobby Lobby engaged in a series of telephonic discussions with ICE and the U.S. Attorney's Office for the Eastern District of New York (ICE and the U.S. Attorney's Office have been referenced together herein as the "Government"). During those discussions, Hobby Lobby was advised that (i) Christie's had sold the Tablet to Hobby Lobby knowing that the provenance it had provided was false, in that the Tablet had not been sold at Butterfield's in 1981 but, rather, imported in 2003 by the American Dealer from London to the United States, (ii) the Tablet was stolen property belonging to the Republic of Iraq, and (iii) the Tablet was imported illegally by the American Dealer in 2003 and by Christie's in 2014 in violation of the National Stolen Property Act.

**Hobby Lobby's Demand on Christie's**

36. On May 5, 2020, Hobby Lobby, through counsel, sent a letter to Christie's general counsel's warning of the Tablet's imminent forfeiture and seeking a refund of the Purchase Price under customary terms for such a claim. By telephone on May 7, 2020, Christie's in-house counsel notified Hobby Lobby's counsel that it would not agree to the terms

---

[5] 18 U.S.C. §§2314 and 2315.

of Hobby Lobby's reasonable request. As a result, Hobby Lobby was forced to decline to stipulate voluntarily to the Government's forfeiture of the Tablet.

**The Government's Forfeiture Action**

37. On May 18, 2020, the U.S. Attorney's Office for the Eastern District of New York commenced the Forfeiture Action in this Court entitled *United States v. One Cuneiform Tablet known as the "Gilgamesh Dream Tablet"*, (Index No. 20 CV 2222 (EDNY)) to recover the Tablet on the basis of evidence it claims establishes that the Tablet was stolen from Iraq and illegally imported into the United States first by the American Dealer in 2003 and again by Christie's in 2014.

38. Hobby Lobby will appear in the Forfeiture Action as a claimant and will join its claims against Christie's and John Doe #1 in the present action with the Government's claims in the Forfeiture Action.

**FIRST CLAIM FOR RELIEF**

(Against Christie's and John Doe #1 For Breach of the Warranty of Title and Against Infringement Under NY UCC § 2-312)

39. Hobby Lobby repeats and realleges each allegation set forth in paragraphs 1 through 38, inclusive, as if set forth herein.

40. Under New York Uniform Commercial Code ("NY UCC") §2-312(1)(a), the seller in a contract for the sale of goods impliedly warrants, among other things, that:

    (a) the title shall be good, and its transfer rightful; and

    (b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

11

41. The Tablet has been seized by the Government, which seeks, through the Forfeiture Action, to recover the object and repatriate it to Iraq on the ground that it was stolen from Iraq and illegally imported into the United States.

42. Accordingly, the NY UCC §2-312(1) warranties by Christie's, as Seller's agent, and John Doe #1, as Seller in connection with the Private Sale Agreement, were false. The Seller did not have lawful title to the Tablet and could not lawfully transfer the object to Hobby Lobby. In addition, the Tablet was not "free from any security interest or other lien or encumbrance" because it was lawfully owned by Iraq, a fact of which Hobby Lobby, as Buyer, had no knowledge at the time of the Purchase.

43. By reason of the foregoing, Christie's and John Doe #1 breached their warranties under NY UCC §2-312(1).

44. As a proximate result of these breaches, Hobby Lobby has been damaged and is entitled to recover the Purchase Price of $1,674,000 together with interest from July 2014 and attorney's fees and costs.

## SECOND CLAIM FOR RELIEF

(Against Christie's and John Doe #1 for Breach of Implied Warranty:
Merchantability; Usage of Trade Under NY UCC §2-314(2))

45. Hobby Lobby repeats and realleges each allegation set forth in paragraphs 1 through 44, inclusive, as if fully set forth at length herein.

46. Under NY UCC §2-314, there is implied in a sale of goods a warranty that the goods are merchantable if the seller is a merchant with respect to goods of that kind. As applied to the present case, subsection (2)(c) requires that, to be merchantable, the goods at issue be "fit for the ordinary purposes for which such goods are used." To be "fit for the ordinary purposes

for which such goods are sued," the goods must be honestly resalable in the normal course of business because they are what they purport to be.

47. Christie's, as agent for Seller John Doe #1, deals regularly in goods such as the Tablet and, accordingly, is a "merchant" within the meaning of NY UCC §2-104.[6]

48. The Government's seizure of the Tablet and commencement of the Forfeiture Action has rendered the Tablet wholly unsalable and, therefore, not merchantable within the meaning of §2-314(2)(c).

49. By reason of the foregoing, Christie's and John Doe #1 have breached the warranty of merchantability under NY UCC §2-314.

50. As a proximate result of these breaches, Hobby Lobby has been damaged and is entitled to recover the Purchase Price of $1,674,000 together with interest from July 2014 and attorney's fees and costs.

## THIRD CLAIM FOR RELIEF

(Against Christie's and John Doe #1 For Breach of Express Warranty By Affirmation, Promise, Description, Sample Under NY UCC § 2-313)

51. Hobby Lobby repeats and realleges each allegation set forth in paragraphs 1 through 50, inclusive, as if fully set forth at length herein.

52. Under NY UCC § 2-313, an express warranty by a seller of goods is created, among other ways, as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

---

[6] Under NY UCC §2-104, a "merchant" is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed."

13

    (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

53. Prior to and after the Purchase, for the purpose of inducing Hobby Lobby to consummate the Purchase, and as part of the basis of the bargain for the Purchase, Christie's represented, warranted, and affirmed to Hobby Lobby, expressly and unequivocally, in the Private Sale Catalogue and in emails, that the Tablet was sold by Butterfield's in 1981 in San Francisco and that the only subsequent owner was an American bookseller. That provenance, critically, reflected that the Tablet had been imported into the United States at a time when there were no import restrictions on Iraqi cultural property and that the Tablet had remained in the United States since 1981. Hobby Lobby had required Christie's affirmation of the Tablet's provenance in writing as an express condition of the sale.

54. Further, pursuant to the Seller's Warranties in the Private Sale Agreement, Christie's and the Seller expressly represented and warranted to Hobby Lobby that (i) the Seller was the owner of the Tablet, (ii) the Seller could transfer ownership to the Tablet without any restrictions or claims by a third party, and (iii) the Seller met all import and export requirements and was not aware that any third party had failed to do so. The Butterfield's Provenance in the Private Sale Catalogue was inextricably woven with and integral to the Seller's Warranties in the Private Sale Agreement because it provided the sole factual basis for the Seller's Warranties.

55. Christie's representations and warranties in the Private Sale Catalogue and emails and the Seller's Warranties in the Private Sale Agreement were false. In fact, the Tablet was stolen from Iraq and illegally imported into the United States after 1990. Thus, the provenance Christie's provided in the Private Sale Catalogue, as affirmed in separate emails, that set forth a provenance including a 1981 sale of the object in the United States was false. Each of the

14

Seller's Warranties was also false, as the Seller was not in fact the rightful owner of the Tablet and thus could not transfer lawful ownership of the object and because United States import requirements with respect to the Tablet had, in view of its illegal importation, clearly not been met.

56. By reason of the foregoing, Christie's, individually and in its capacity as Seller's agent under the Private Sale Agreement, and John Doe #1, as Seller, breached their respective express warranties under NY UCC §2-313.

57. As a proximate result of these breaches, Hobby Lobby has been damaged and is entitled to recover the Purchase Price of $1,674,000 together with interest from July 2014 and attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF

(Against Christie's for Fraud)

58. Hobby Lobby repeats and realleges each allegation set forth in paragraphs 1 through 57, inclusive, as if fully set forth at length herein.

59. Prior to and after the Purchase, for the purpose of inducing Hobby Lobby to consummate the Purchase, and as part of the basis of the bargain for the Purchase, Christie's represented to Hobby Lobby, expressly and unequivocally, in the Private Sale Catalogue and in separate emails that, based on its actual knowledge of the Tablet's sale history and provenance, the Tablet had been sold by Butterfield's on August 20, 1981, lot 1503.  Christie's knew that this representation was false, and that the Butterfield's Provenance had been invented by the American Dealer without any basis in fact. Further: (i) in the Private Sale Catalogue, Christie's deceitfully omitted reference to the American Dealer, creating the erroneous impression that the Tablet had been in the United States continuously since at least 1981; (ii) Christie's deceitfully

15

withheld documentation from Hobby Lobby concerning the Tablet's provenance, specifically a 2007 letter from the American Dealer, leading Hobby Lobby to believe Christie's had no such documents when in fact Christie's did; and (iii) Christie's deceitfully represented and warranted in the Private Sale Agreement that the Seller was the Tablet's owner, could transfer ownership free of restrictions or third-party claims, had met all import and export restrictions, and was not aware that any third party had failed to do so.

60. Christie's further knew that Hobby Lobby (i) had expressly required Christie's representation as to the Tablet's provenance as a condition of the Purchase, (ii) was purchasing the Tablet to lend and/or donate the object to MOTB, (iii) would rely on Christie's statements, and (iv) would not purchase the Tablet unless Christie's representations and warranties were true. Indeed, Hobby Lobby required Christie's representation as to the Tablet's provenance in writing as an express condition of the Purchase.

61. Hobby Lobby reasonably relied on Christie's representations in purchasing the Tablet. Although Hobby Lobby conducted a reasonable and customary due diligence investigation on the Tablet, it discovered no reason to question the truth, accuracy and completeness of Christie's various statements, misstatements, and omissions which cumulatively amounted to a lie. Hobby Lobby would not have made the Purchase if it had known that the Tablet had been stolen from Iraq and imported in violation of United States laws.

62. Moreover, in 2017, Christie's reaffirmed the accuracy of the provenance it had previously provided when it had no basis to do so, thus preventing Hobby Lobby from discovering the truth and taking prompt steps to rescind the Purchase.

63. By reason of the foregoing, Hobby Lobby has been damaged as a proximate cause of Christie's deceitful and fraudulent conduct and is entitled to rescind the Purchase and recover the Purchase Price of $1,674,000 together with interest from July 2014 and attorney's fees and costs.

## **DEMAND FOR RELIEF**

WHEREFORE, Hobby Lobby demands judgment against the Defendants, jointly and severally, as follows:

(a) rescinding the Purchase of the Tablet and requiring Defendants to return the $1,674,000 Purchase Price to Hobby Lobby together with interest from July 2014 as allowed by law;

(b) awarding Hobby Lobby all attorneys' fees and expenses and other costs it has incurred in this action; and

(c) granting any further and different relief as the Court deems just and proper.

Dated: New York, New York
May 18, 2020

Respectfully submitted,

Pearlstein & McCullough LLP

By: _____
    Michael McCullough
    Anju Uchima

641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel: (646) 762-7264
MMcCullough@PMCounsel.com
AUchima@PMCounsel.com

Attorneys for Plaintiff